**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANNA SIBETO, | CIVIL ACTION No. _____ |
| Plaintiff, | |
| | **ELECTRONICALLY FILED** |
| v. | |
| CAPELLA UNIVERSITY, | |
| Defendant. | **COMPLAINT IN CIVIL ACTION** |
| | |
| | Filed on behalf of Plaintiff: |
| | Anna Sibeto |
| | |
| | Counsel of Record for this Party: |
| | |
| | Charles E. Steele, Esquire |
| | PA I.D. No. 36583 |
| | Alex J. Barker, Esquire |
| | PA I.D. No. 316871 |
| | STEELE SCHNEIDER |
| | Lawyers Building |
| | 428 Forbes Avenue, Suite 700 |
| | Pittsburgh, PA 15219 |
| | (412) 235-7682 |
| | (412) 235-7693/facsimile |
| | charliesteele@steeleschneider.com |
| | alexbarker@steeleschneider.com |
| | |
| | **JURY TRIAL DEMANDED** |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANNA SIBETO, | CIVIL ACTION No. _____ |
| Plaintiff, | |
| v. | **ELECTRONICALLY FILED** |
| CAPELLA UNIVERSITY, | |
| Defendant. | |

# COMPLAINT

Plaintiff Anna Sibeto, by her undersigned attorneys, files this Complaint against Defendant Capella University and states the following:

**Jurisdiction and Venue**

1. This action arises under Pennsylvania law.

2. Jurisdiction is conferred on the Court by 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.

3. Venue in this District is proper under 28 U.S.C. § 1391(b)(2).

**Parties**

4. Plaintiff Anna Sibeto is an adult individual and a Pennsylvania resident residing at 1311 Crest Lane, Oakdale, PA 15071.

5. Defendant Capella University is a Minnesota corporation headquartered at 225 South Sixth Street, Ninth Floor, Minneapolis, MN 55402. Capella conducts substantial business in Western Pennsylvania.

**Factual Background**

6. Prior to summer 2003, Plaintiff earned a master's degree in education and was employed as a Spanish and French teacher at Moon High School, where she is still employed.

7. Plaintiff decided to further her career by earning a doctoral degree, which would allow her to earn increased income and pursue other job opportunities that required a doctoral degree, including teaching at the university level.

8. In July of 2003, Plaintiff applied to Capella's Professional Studies doctoral program in Capella's School of Education.

9. Capella understood that Plaintiff's sole purpose in seeking admission was to receive a Doctorate in Professional Studies.

10. Capella enrolled Plaintiff as a doctoral student in the summer semester of 2003.

11. Upon Plaintiff's enrollment, a valid and binding contract formed between the parties whereby Plaintiff agreed to purchase and Capella agreed to provide a doctoral-level education culminating in Capella awarding Plaintiff a doctoral degree after she completed certain requisite coursework.

12. At all times, Capella controlled the requirements of this degree and whether Plaintiff's work toward the completion of these requirements would be considered satisfactory.

13. Based on the parties' contract and Capella's control of the determination of Plaintiff's success, Capella was bound by duties of good faith and fair dealing to keep Plaintiff apprised of her progress in the doctoral program and whether her progress was satisfactory to Capella.

14. Capella requires doctoral students to complete prerequisites prior to beginning work on their dissertations.

15. Plaintiff successfully completed all of the prerequisites to begin work on her dissertation.

16. The successful completion of a dissertation is a necessary prerequisite to earning the doctoral degree sought by Plaintiff.

17. After enrolling Plaintiff, Capella provided Plaintiff a document titled, "Dissertation Manual." A true copy of the Manual is attached as Exhibit A.

18. The Manual describes the terms and conditions for Plaintiff's completion of a dissertation.

19. Per the Manual, Capella requires doctoral students to collaborate with a dissertation mentor throughout the dissertation process.

20. The Manual states that its purpose is to "[provide] an overview of the dissertation process and [describe] in broad terms the roles and responsibilities of the learner, the mentor and dissertation committee members, the dissertation course instructor, and the university support

staff."

21. The Manual describes the mentor's duties in assisting Capella doctoral students such as Plaintiff through the dissertation process:

   a. The mentor is to "[guide] and [support] the learner as he or she develops and demonstrates competencies in critical thinking, analysis, synthesis, and integration of relevant theories and research."

   b. "The mentor provides feedback on the learner's writing and research skills and refers the learner to additional support and resources within the university when those skills need further development."

   c. "During the dissertation process, the learner and the mentor will be engaged in collaborative efforts involving the communication skills of writing, discussing, and negotiating."

   d. "The mentor should ensure that the proposal/prospectus and the completed dissertation comply with all criteria used to evaluate acceptable scholar-practitioner work at the doctoral level."

   e. "The faculty mentor, as chair of the dissertation committee, is primarily responsible for guiding the learner through the development of the proposal/prospectus and supervising the learner in conducting the research project."

22. The Manual also states that "no more than one change of mentor (in the comprehensive and dissertation phases) and one change of dissertation committee will be permitted."

23. The Manual also sets forth the roles and responsibilities of the dissertation committee.

24. The Manual states that the dissertation committee "has the sole authority and responsibility for accepting and endorsing the proposal/prospectus and final dissertation manuscript prior to the final approval by the school's dean or the dean's designee."

25. During the winter semester of 2005, Capella directed Plaintiff to select a mentor to guide her through the comprehensive requirements and dissertation.

26. Plaintiff selected Capella professor Dr. Rita Conrad as her mentor, and Dr. Conrad accepted the responsibility.

27. Plaintiff believed that Dr. Conrad would be her mentor throughout the entire comprehensive and dissertation processes.

28. Dr. Conrad had very little, if any, communication with Plaintiff while Plaintiff was in the comprehensive stage of her Capella education.

29. Plaintiff successfully completed the comprehensive requirements at the end of the spring semester of 2005.

30. Upon completion of the comprehensive classes, Plaintiff's next step to earning her doctoral degree from Capella was to write her dissertation.

31. In order to pass the dissertation stage, Capella required each dissertation to contain five chapters.

32. Plaintiff began her dissertation research in the fall quarter of 2005.

33. Dr. Conrad did not successfully complete her duties as Mentor as described by the Manual.

34. Dr. Conrad offered Plaintiff no feedback or guidance while Plaintiff researched for and began to write her dissertation.

35. In failing to provide Plaintiff with guidance and feedback, Dr. Conrad failed to adhere to the mentor requirements set forth by the Manual.

36. In June 2006, Dr. Conrad decided that she could no longer act as Plaintiff's mentor and informed Plaintiff that she should find another mentor.

37. In June 2006, Plaintiff asked Capella professor Dr. Amar Almasude to be her dissertation mentor.

38. Dr. Almasude agreed to mentor Plaintiff.

39. Dr. Almasude did not offer Plaintiff any feedback or guidance regarding her dissertation.

40. In failing to provide Plaintiff with guidance and feedback, Dr. Almasude failed to adhere to the mentor requirements set forth by the Manual.

41. Plaintiff continued to write and re-write her dissertation throughout Dr. Almasude's tenure as her mentor.

42. In January 2008, Plaintiff contacted her academic advisor at the time, Stacy Sculthorp, and informed her that Dr. Almasude was not properly completing his duties as Plaintiff's dissertation mentor.

43. Sculthorp told Plaintiff to contact the head of the Department of Professional Studies for assistance in moving forward with writing her dissertation.

44. The head of Capella's Department of Professional Studies responded by recommending that Plaintiff find a new mentor.

45. In response to Plaintiff's mentor-related difficulties, Capella reimbursed Plaintiff for one quarter of the tuition she paid up until that point.

46. In July 2008, Capella recommended that Plaintiff change her mentor to Capella professor Dr. Jason Ward.

47. From July 2008 until December 2011, Dr. Ward acted as Plaintiff's mentor during her dissertation process.

48. In July 2008, Capella also changed Plaintiff's academic advisor from Stacy Sculthorp to Jonathan Gehrz.

49. In July 2008, Dr. Ward informed Plaintiff about Capella's continuous enrollment policy.

50. At that time, Capella designated Plaintiff as an inactive student.

51. Dr. Ward told Plaintiff that pursuant to Capella's policy, students could remain inactive for only one quarter or they risk dismissal from Capella.

52. Dr. Ward proposed that Plaintiff apply to Capella for an appeal in order to remain in the doctoral program.

53. In July 2008, Dr. Ward suggested that Plaintiff continue working on her existing dissertation in order to move forward in the program.

54. Dr. Ward never indicated that Plaintiff's dissertation as written was below Capella's passing standards.

55. From July 2008 through December 2011, Dr. Ward consistently gave Plaintiff feedback and advice on the first few chapters of her dissertation.

56. Plaintiff made all of the corrections proposed by Dr. Ward on her dissertation from July 2008 until February 2011.

57. From July 2008 until February 2011, Dr. Ward consistently informed Plaintiff that her dissertation drafts were "fine."

58. Upon information and belief, Dr. Ward merely skimmed Plaintiff's dissertation drafts and proposals.

59. Dr. Ward did not provide Plaintiff any meaningful direction regarding her dissertation before it went to the committee.

60. In July 2010, Dr. Ward assured Plaintiff via email that she was "getting close to a 'pass[ing]'" grade on the dissertation.

61. From July 2008 until February 2011, Dr. Ward submitted Plaintiff's dissertation to Capella's dissertation committee for review one to three times per year.

62. Every time that Dr. Ward submitted Plaintiff's dissertation, Capella's dissertation committee made changes to Plaintiff's dissertation, requested further changes, and returned it to her.

63. The dissertation committee gave Plaintiff feedback and suggestions on her dissertation that often contradicted the feedback and suggestions she received from Dr. Ward.

64. In early 2009, Dr. Ward once again informed Plaintiff that her dissertation proposal was "fine."

65. At that time, Dr. Ward suggested that Plaintiff start the IRB process, the next step to receiving her doctorate degree.

66. In March 2009, Plaintiff submitted her dissertation to the dissertation committee.

67. In response, the dissertation committee informed Plaintiff that she had to entirely re-write her dissertation and come up with a new proposal.

68. In the summer of 2009, Capella required Plaintiff to complete the Advanced Practicum in Research Design course to assist Plaintiff with her dissertation writing struggles.

69. Plaintiff earned an A grade in this course.

70. Dr. Ward and Gehrz encouraged Plaintiff to apply for multiple extensions from Capella to complete her dissertation.

71. Relying on their advice, Plaintiff applied for extensions at least three times.

72. Each time, Capella granted Plaintiff's requests for extensions so she could finish her dissertation and earn her doctoral degree.

73. Prior to February 2011, none of Capella's representatives, including Plaintiff's mentors and the dissertation committee, ever indicated to Plaintiff that she could not complete the dissertation and receive a doctoral degree.

74. In February 2011, Capella first informed Plaintiff that it would not allow her any more time to complete her dissertation and other doctoral work.

75. Gehrz suggested that Plaintiff apply her completed coursework towards a master's degree in professional studies.

76. Plaintiff refused to accept this degree.

77. In response, Capella gave Plaintiff yet another chance to finish her dissertation.

78. In May 2011, Gehrz directed Plaintiff to continue working on her dissertation and collaborating with Dr. Ward.

79. On May 4, 2011, Gehrz suggested that Plaintiff complete her dissertation proposal and gain dissertation committee approval of the same by June 17, 2011.

80. Later in May 2011, Dr. Ward once again informed Plaintiff that chapter one of her dissertation proposal was "fine."

81. Dr. Ward also suggested that Plaintiff make certain changes to chapter three.

82. Dr. Ward told Plaintiff that her proposal would be "fine" if she made these changes.

83. Plaintiff made all of the changes suggested by Dr. Ward to chapter three of her dissertation before submitting it to the dissertation committee.

84. In June 2011, Dr. Bonita Wilcox, a member of the dissertation committee, informed Plaintiff that chapter three of her dissertation still needed "a little work."

85. Plaintiff then asked Dr. Ward for specific details and suggestions regarding further changes she could make to chapter three of her dissertation in order to earn the dissertation committee's approval.

86. Dr. Ward never responded to Plaintiff's inquiry.

87. On June 7, 2011, ten days before Plaintiff's June 17, 2011 proposal deadline, Gehrz informed Plaintiff that she was "not situated to meet the deadline and feasibly not situated to even secure committee approval in the time remaining."

88. Despite his own statement, Gehrz directed Plaintiff to continue her dissertation effort "through the end."

89. Plaintiff then asked Gehrz for specific details and suggestions regarding her dissertation.

11

90. Gehrz recommend only that Plaintiff continue her effort towards completing her dissertation until Capella directed her otherwise.

91. Plaintiff did not meet the June 17, 2011 proposal deadline.

92. Plaintiff was unable to meet this deadline due to the lack of direction and guidance she received from Gehrz and Dr. Ward.

93. Following the June 17, 2011 deadline, Capella gave Plaintiff until the end of the fall 2011 semester to finish her dissertation and obtain approval.

94. Plaintiff continued to work on dissertation throughout the fall 2011 semester.

95. In December 2011, Capella informed Plaintiff that her dissertation was not adequate to earn the dissertation committee's approval.

96. Capella then told Plaintiff that she could no longer remain in the doctoral program.

97. Capella told Plaintff that without the committee's approval of her dissertation, her only option was to have her doctoral work applied to a Master's Degree in Professional Studies.

98. Plaintiff had no interest in receiving a Master's Degree in Professional Studies.

99. Until February 2011, Capella personnel led Plaintiff to believe that she was in compliance with Capella's doctoral degree requirements.

100. Capella personnel created a situation in which Plaintiff was repeatedly led to believe that Capella found her progress in the doctoral program to be satisfactory, only to be

subsequently informed that her work was inadequate and that she would need to complete further work in order to produce a satisfactory dissertation.

101. These persons provided false information to Plaintiff by repeatedly leading her to believe that her dissertation work was satisfactory when in fact it was not.

102. The representations of Capella personnel caused Plaintiff to stay enrolled in Capella for many continuous semesters because she was led to believe that she was close to finishing her doctoral work and would indeed finish if she stayed enrolled.

103. The actions of Capella personnel violated the duties of good faith and fair dealing owed by Capella to Plaintiff.

104. Throughout the period of her enrollment, Plaintiff continued to pay Capella tuition and academic expenses.

105. As a result of Capella's actions, Plaintiff has suffered significant damages, including the following:

   a. tuition paid and/or financed;

   b. other education-related expenses for materials and travel to required colloquias;

   c. lost time;

   d. increased income;

   e. and the ability to pursue advanced job opportunities.

## Count I: Breach of Contract

106. A binding and enforceable contract existed between Plaintiff and Capella whereby Plaintiff agreed to purchase and Capella agreed to provide a doctoral education culminating Capella awarding Plaintiff a doctoral degree.

107. Per the terms of this contract, Plaintiff was to complete certain coursework and other graduation requirements, including a satisfactory written dissertation.

108. Capella controlled the determination of whether Plaintiff's dissertation would be deemed satisfactory.

109. Capella was to provide Plaintiff with feedback and guidance regarding her progress toward the successful completion of a dissertation.

110. Capella failed to provide Plaintiff any meaningful feedback and guidance regarding her dissertation.

111. Capella repeatedly led Plaintiff to believe that her dissertation work was satisfactory when in fact it was not.

112. Capella personnel repeatedly led Plaintiff to believe that minor changes to her dissertation work would render it satisfactory.

113. The actions of the Capella personnel resulted in Plaintiff being unable to successfully finish her dissertation.

114. Capella breached the parties' contract by directing and/or failing to direct Plaintiff's dissertation work in a manner that caused Plaintiff to be unable to successfully complete the work required of the doctoral degree offered by Capella.

115. As a result of Capella's breach of the contract, Plaintiff suffered substantial damages.

**Count II: Intentional Misrepresentation**

116. Capella represented to Plaintiff that she could earn a doctoral degree by paying tuition and completing certain coursework, including a written dissertation.

117. Capella further represented to Plaintiff that Capella personnel would mentor and guide her throughout the dissertation process toward her successful completion of the same.

118. Capella personnel repeatedly represented to Plaintiff that she was very close to successfully completing her dissertation.

119. Capella's representations were material inasmuch as Capella controlled the means by which Plaintiff's dissertation work would be deemed "successful."

120. Capella's representations to Plaintiff were false and made with knowledge of their falsity and/or recklessness as to the same.

121. Capella intended to mislead Plaintiff into believing that if she continued to pay tuition and follow the instruction of Capella personnel, she would soon successfully complete her dissertation and earn a doctoral degree.

122. Plaintiff justifiably relied on Capella's representations inasmuch as Capella personnel controlled whether Plaintiff's work would be considered satisfactory.

123. As a result of her reliance on Capella's representations, Plaintiff suffered substantial damages.

### Count III: Negligent Misrepresentation

124. Capella represented to Plaintiff that she could earn a doctoral degree by paying tuition and completing certain coursework, including a written dissertation.

125. Capella further represented to Plaintiff that Capella personnel would mentor and guide her throughout the dissertation process toward her successful completion of the same.

126. Capella personnel repeatedly represented to Plaintiff that she was very close to successfully completing her dissertation.

127. Capella's representations were material inasmuch as Capella controlled the means by which Plaintiff's dissertation work would be deemed "successful."

128. Capella knew or should have known that its representations to Plaintiff were false.

129. Capella intended to cause Plaintiff to believe that if she continued to pay tuition and follow the instruction of Capella personnel, she would soon successfully complete her dissertation and earn a doctoral degree.

130. Plaintiff justifiably relied on Capella's representations inasmuch as Capella personnel controlled whether Plaintiff's work would be considered satisfactory.

131. As a result of her reliance on Capella's representations, Plaintiff suffered substantial damages.

**Count IV: Violation of Unfair Trade Practices and Consumer Protection Law**

132. Plaintiff is a consumer who contracted to purchase education services from Capella for the purpose of completing Capella's educational studies doctoral program and obtaining a doctoral degree.

133. Plaintiff entered into a contract with Capella, paid Capella tution and other expenses, and took on other education-related expenses reasonably foreseeable to Capella.

134. Capella represented to Plaintiff that she could earn a doctoral degree by paying tuition and completing certain coursework, including a written dissertation.

135. Capella further represented to Plaintiff that Capella personnel would mentor and guide her throughout the dissertation process toward her successful completion of the same.

136. Capella personnel repeatedly represented to Plaintiff that she was very close to successfully completing her dissertation.

137. Capella gave Plaintiff written guarantees regarding the guidance she would receive from Capella personnel throughout the dissertation process.

17

138. Capella failed to comply with the terms of its guarantees to Plaintiff inasmuch as Capella personnel provided Plaintiff no meaningful guidance toward the successful completion of her dissertation.

139. Capella engaged in deceptive conduct inasmuch as Capella made repeated assurances to Plaintiff regarding the success of her dissertation work but ultimately forced her to withdraw from the doctoral program after approximately eight years of doctoral work.

**Prayer for Relief**

Plaintiff requests judgment against Capella for the following:

1. compensatory damages in an amount to be determined at trial, including all tuition and other education-related expenses paid by plaintiff, lost time, and lost future income;

2. treble damages;

3. punitive damages in an amount to be determined at trial;

4. costs to bring this action, including attorneys' fees; and

5. all other appropriate relief as the court may deem just and proper.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Date: November 18, 2013 | */s/ Alex J. Barker*<br>Charles E. Steele, Esquire<br>PA I.D. No. 36583<br>Alex J. Barker, Esquire<br>PA I.D. No. 316871<br>STEELE SCHNEIDER<br>428 Forbes Avenue, Suite 700<br>Pittsburgh, PA 15219<br>(412) 235-7682<br>(412) 235-7693/facsimile<br>charliesteele@steeleschneider.com<br>alexbarker@steeleschneider.com |